IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CYNTHIA SATTERWHITE,          )
                              )
          Plaintiff,          )
                              )
     v.                       )          CASE NO. 2:19-CV-868-WKW
                              )                    [WO]
COCA-COLA BOTTLING            )
COMPANY UNITED, INC.,         )
                              )
          Defendant.          )

## MEMORANDUM OPINION AND ORDER

Before the court is Coca-Cola Bottling Company United's ("Coke United")

motion for summary judgment.  (Doc. # 31.)  Plaintiff Cynthia Satterwhite brings

three claims under Title VII of the Civil Rights Act and 42 U.S.C. § 1981.  Coke

United argues that Satterwhite has failed to prove her discriminatory termination

claim because her comparator is not sufficient and because her evidence of pretext

is lacking.  Coke United further argues that Satterwhite's retaliatory termination

claim fails because there is insufficient evidence of causation and because her

evidence of pretext is lacking.  Lastly, Coke United argues that Satterwhite has failed

to show how its actions "altered the terms or conditions" of Satterwhite's

employment, as needed to prove a claim of hostile work environment.

Summary judgment is not appropriate for Satterwhite's discriminatory and

retaliatory termination claims.  As noted below, there is a genuine dispute of material

fact that clouds the issues of whether Palmer is an appropriate comparator and whether the termination decision was pretextual.  However, Satterwhite has not presented enough evidence to support her claim for hostile work environment.  The court will therefore deny Coke United's motion in part and grant it in part.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4).  The parties do not contest personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce

admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists.  *Celotex Corp.*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

### III.  BACKGROUND

Satterwhite, an African American woman, began working for Coke United in October 2014, after about a decade with a predecessor Coke bottler.  (Doc. # 33-1 at 42.)  Satterwhite was a Business Development Manager ("BDM").  In this position, Satterwhite was responsible for visiting existing customers, investigating new customers, dealing with customer issues, and communicating with other departments

at Coke United.  Satterwhite generally worked in Montgomery and neighboring cities to the north and west.  (Doc. # 33-1 at 43, 47–48.)[1]

On June 1, 2018, Beryl Jackson became Satterwhite's supervisor.  (Doc. # 33-1 at 48.)  Jackson, also an African American woman, remained Satterwhite's immediate supervisor for the remainder of Satterwhite's employment at Coke United.  (Doc. # 33-1 at 14, 60–61.)  On June 15, 2018, Jackson gave an initial presentation to her subordinate BDMs.  (Doc. # 33-1 at 64–78.)  In the presentation, Jackson laid out an expectation that the BDMs engage in heightened communication practices, but she did not specify a particular method or frequency of communication.  Jackson did lay out specific expectations in other areas.  Jackson required the BDMs to work from 7 a.m. to 5 p.m. and expected them to make 10–12 customer visits per day.  The BDMs were expected to log their activity in a software program called Spring Mobile and were expected to log daily mileage by hand.  Eventually, in January 2019, Coke United adopted another software called Motus to track mileage.  (Doc. # 33-1 at 173–174.)

On September 10, 2018, Jackson orally coached Satterwhite in a meeting with Satterwhite and an Area Manager, Billy Lockhart.  The feedback given to Satterwhite was generally in response to two incidents: one where a communication

---

[1] Where a deposition is cited herein, the cited pages refer to the deposition pages.  Citations otherwise use the pagination as listed in CM/ECF.

from Satterwhite was perceived by Jackson to have been incomplete, and another where an email from Satterwhite was perceived by Jackson to imply that Satterwhite had started work late that day. However, other issues were discussed in the meeting. Jackson told Satterwhite that two customers had expressed issues with Satterwhite and had asked that Satterwhite not return. The next day, Jackson sent Satterwhite an email recap of the meeting, noting that the email served as a verbal coaching—the first disciplinary step in Coke United's employee handbook. Coke United has an official form for verbal coaching that was not used in the meeting or email. (Docs. # 33-1 at 80–98; 33-3 at 35.)

Jackson's supervisor, Allen Smoot, approached Satterwhite two days after the meeting and told Satterwhite that management was concerned about her job performance. Smoot suggested a one-on-one meeting, which Satterwhite scheduled for September 17, 2018. In the meeting with Smoot, Satterwhite relayed her concerns with how Jackson was managing the BDMs. (Doc. # 33-1 at 102–13.)

On October 12, 2018, Satterwhite met with Jackson, Smoot, and Employee Relations Manager James Trammell to discuss Satterwhite's performance. (Doc. # 33-1 at 120–35.) At that meeting, Jackson disclosed the names of the two clients who had expressed a displeasure with Satterwhite's performance. Satterwhite asked to talk with the customers to respond to any concerns, and Trammell agreed. At the end of the meeting, Satterwhite said that she did not trust Jackson. Satterwhite stated

that she believed Jackson was unapproachable, mean-spirited, and used her position to intimidate people.  (Doc. # 33-1 at 133.)

Following the meeting, Satterwhite contacted the two customers and asked if there were any problems that caused them to not want her back in their stores.  Both customers reported that no problem existed, and both indicated that they had never spoken to Jackson.  After speaking with the customers, Satterwhite set up a meeting with Trammell to discuss her findings.  At the meeting, Satterwhite asked Trammell to investigate the issue.  Trammell met again with Satterwhite after a period of days and told Satterwhite that Jackson "misspoke" about the two customers.  (Doc. # 33-1 at 159–60.)

Later in October 2018, Satterwhite met with Trammel a third time, where she complained to Trammel that she was being targeted because of her race and was being disciplined for the same things that her white co-workers were doing without being disciplined.   Satterwhite told Trammell that she believed she was being targeted by Jackson because of her race.  (Doc. # 33-1 at 117–18; 167–69.)

Satterwhite took medical leave at the end of October 2018.   She communicated her leave request via email.  She had not been told to communicate the request in any other way.   When the leave pushed into early November, Trammell recommended that Satterwhite take FMLA leave.  Trammell instructed Satterwhite to send pending matters to Jackson and then leave the rest of the

6

coordination to Trammell.  Satterwhite's FMLA leave lasted from November 8, 2018, through January 13, 2019.  During her leave, she filed her first EEOC charge of race discrimination.  (Doc. # 33-1 at 163–73.)

On January 14, 2019, Satterwhite had a meeting with Jackson to discuss the new Motus system for tracking mileage.  No discipline was mentioned during this meeting.  (Doc. # 33-1 at 174–77.)  However, on January 18, 2019, Satterwhite was called into another meeting with Jackson and Trammell where she was given a written warning by Jackson for unacceptable job performance.  All of the events listed in the written warning took place before Satterwhite's FMLA leave.  Jackson testified that she began preparing the warning before the leave took place but could not administer it in time.  Part of the warning revolved around Satterwhite's absence reporting methods, where Jackson apparently wanted communication by telephone instead of email.  (Doc. # 33-1 at 177–85.)

On Friday, March 8, 2019, Satterwhite attended a meeting run by a company vice-president.  Satterwhite did not sit near her team of BDMs and missed a message that the team would be meeting afterwards.  Jackson allowed a white BDM to skip the meeting to go home.  Satterwhite left.  She had put her phone on silent for the meeting and did not see a later text asking her to come back to the conference room.  Satterwhite's phone was a work phone, and she did not use it that weekend.  (Doc. # 33-1 at 196–207.)

On Wednesday, March 13, 2019, Satterwhite received a final written warning from Jackson because she missed the team meeting.  The absence was not discussed with Satterwhite before the warning was issued.  Satterwhite emailed Trammel and Jackson that day, complaining that she was being retaliated against because of the EEOC charge.  Trammel forwarded the email to an HR Manager, who said: "Here we go."  Trammel told the HR Manager that he did not intend to respond to the complaint.  (Doc. # 33-3 at 45.)

Satterwhite's bonus for the first quarter of 2019 was reduced because of the final written warning, although Jackson and Trammell did not state a basis in the company policy for the reduction when asked.  Only later did Jackson and Trammell modify the final written warning to permit the bonus reduction.  (Doc. # 33-1 at 209–14.)

In May 2019, Satterwhite once again went on medical leave.  During this leave, she filed an amended EEOC charge.  Satterwhite returned on May 20, 2019, and met with Jackson that day.  Jackson told Satterwhite to catch up on her work and did not mention any disciplinary problems.  As a result of Satterwhite's focusing on catchup work, she failed to visit three low-volume clients as expected.  Satterwhite reported this to Jackson.  (Doc. # 33-1 at 214–26.)[2]

---

[2] Jackson may have interpreted the email as saying that Satterwhite did not visit *any clients* during the week of May 20, 2019, (Doc. # 33-2 at 149, 154), though the reports reviewed by Jackson before Satterwhite's termination showed that Satterwhite *had* made visits during that week

Around May 29, 2019, Satterwhite's tablet stopped working, and she could no longer log her stops in Spring Mobile. Jackson instructed Satterwhite to log her stops in a spreadsheet instead. Satterwhite did so and regularly emailed the spreadsheets to Jackson to communicate her daily activities. (Doc. # 33-1 at 248–250.)

On June 12, 2019, Jackson prepared a termination notice and forwarded it to the HR Manager, Smoot, and Trammell for review. (Doc. # 33-2 at 159–61.) A decision was made to not terminate Satterwhite at that time. On June 21, 2019, Jackson once again proposed Satterwhite's termination to Smoot and the HR Manager. This termination was also not approved. (Doc. # 33-2 at 170–77.)

On July 1, 2019, Satterwhite was called into a meeting with Jackson and the HR Manager. (Doc. # 33-1 at 220–21.) Satterwhite was confronted with a report from the mileage software, Motus. Motus periodically tracked the GPS location of Satterwhite in order to calculate mileage. (Doc. # 33-1 at 230–38.) According to Satterwhite, Motus does not have perfect accuracy, occasionally reporting the user at an incorrect location. (Docs. # 33-1 at 236–38; 33-4 at 70–72.) Satterwhite indicated that she would need time to review the report. She was instructed to return the next day, July 2, 2019, with notes on the locations. Instead of returning on July

---

(Doc. # 33-2 at 161–62). Taking the facts in the light most favorable to Satterwhite for summary judgment purposes, *see Jean-Baptiste*, 627 F.3d at 820, the court assumes that Jackson knew that Satterwhite was only referring to her low-volume client visits.

2, 2019, Satterwhite went on medical leave for a third time for the next two weeks. (Doc. # 33-1 at 239.)  While on leave, she once again expressed her concern to her supervisors that she was being retaliated against.  (Doc. # 41-9 at 2–3.)  When Satterwhite returned on July 18, 2019, she was again asked to write out an account of her questioned activities on the Motus report.  Satterwhite explained some of the entries, marked some with "N/S" for "not sure," and supplemented her response with her Spring Mobile report and spreadsheet.  (Doc. # 33-1 at 241–48.)  Later that day, Satterwhite was terminated.  The final decision to terminate was not made until after reviewing the documents submitted by Satterwhite.  (Doc. # 33-2 at 207–15.)

Meanwhile, another BDM, a white woman named Jessi Palmer, also worked under Jackson.  Palmer's reports included visits to unnamed locations, longer than normal visits, extremely short visits, days with less than the required number of visits, multiple visits to the same customer, and extended visits to clients who were not supposed to be managed at the regional distributor level.  (Docs. # 41-1 at 4–8 ¶¶ 22–34; 41-2; 41-3.)  Palmer's Spring Mobile log and her Motus report show numerous inconsistencies.  (Docs. # 41-2; 41-3.)  Jackson and the other leadership team members checked the logs of all the BDMs before terminating Satterwhite. (Docs. # 33-2 at 58–60; 33-4 at 60–63.)  Additionally, Palmer has been unresponsive to emails and text messages on occasion.  (Doc. # 41-12.)  Palmer has never been subject to any disciplinary action at Coke United.  (Doc. # 33-2 at 188.)

## IV.  DISCUSSION

**A.**   **Satterwhite has met her burden on her race discrimination claim.**

In order to prove a *prima facie* case of race discrimination under Title VII and 42 U.S.C. § 1981, Satterwhite must prove that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006).  If Satterwhite satisfies these elements, Coke United must provide a legitimate, non-discriminatory reason for its employment action.  *Id.*  Upon that showing, Satterwhite must prove that the proffered reason is pretext for unlawful discrimination.  *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973).

### 1.   *Satterwhite has demonstrated a* **prima facie** *case.*

The only element of Satterwhite's *prima facie* case that has been challenged by Coke United is her comparator evidence under the third element.  (Coke Motion at 11–14.)  In order to be an effective comparator, Palmer must have been "similarly situated in all material respects" to Satterwhite.  *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc).  Coke United argues that Palmer is not an appropriate comparator because, first, she did not share a similar disciplinary

11

history, and second, the decisionmakers were unaware of Palmer's conduct.  (Coke Motion at 13–14.)

Coke United's second reason is unavailing.  Palmer's previous communication failures with clients were known to Jackson because Jackson discussed them in a meeting with Satterwhite.  (Docs. # 33-1 at 84–87; 41-12.)  Further, Jackson reviewed the Spring Mobile and Motus reports of all the BDMs before terminating Satterwhite.  (Docs. # 33-2 at 58–60; 33-4 at 60–63.)  This evidence is sufficient for a trier of fact to conclude that Palmer's misconduct was known to the decisionmakers.

Disciplinary history can, of course, be relevant to the comparator analysis.  *See Lewis*, 918 F.3d at 1228.  And here, Palmer had no documented disciplinary history.  At first blush, Palmer's lack of disciplinary history appears to distinguish her personnel file from that of Satterwhite.  However, Satterwhite's entire disciplinary history solely consists of the discipline that led to Satterwhite's termination.  The cases cited by Coke United only found that differing disciplinary or employment history was material where the differences were independent from the challenged employment action.  *See Lewis*, 918 F.3d at 1228 (not analyzing the issue); *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 305 (6th Cir. 2016) (only discussing the length of time at the company); *Hester v. Univ. of Alabama Birmingham Hosp.*, 798 F. App'x 453, 457 (11th Cir. 2020) (discussing prior,

unrelated misconduct that the plaintiff engaged in but the comparator did not). Indeed, it is sensible to require that the disciplinary history of the Plaintiff be independent from the challenged managerial conduct in order to distinguish a comparator.

Satterwhite has provided evidence that Palmer was due the same discipline as Satterwhite.   (Docs. # 41-2; 41-3; 41-12.)   Under Coke United's progressive discipline policy, Satterwhite could not have been terminated by a supervisor without an oral warning and two written warnings.  (Doc. # 33-2 Ex. 3.)  Thus, the discipline at issue is not independent from the underlying claim of discrimination; whether the discipline was pretextual is ultimately part of the same question as whether the termination itself was pretextual.  The differing disciplinary histories could show either that Palmer and Satterwhite were dissimilarly situated employees, or they could show that Coke United treated similarly situated employees dissimilarly.   With evidence that Palmer and Satterwhite engaged in the same misconduct and that the leadership knew of Palmer's misconduct, it is a jury question, not a proper matter for summary judgment, to decide which is the case.

Because Satterwhite's discipline is not independent from the challenged dismissal and because there is evidence Palmer was due the same discipline, Coke United cannot rely on it to distinguish Palmer as a comparator at the summary

judgment stage.  Palmer being otherwise an unchallenged comparator, Satterwhite has met her burden of providing a *prima facie* case of race discrimination.

### 2.   *Satterwhite has presented sufficient proof of pretext.*

Coke United states that the real reason for Satterwhite's termination was poor performance and Satterwhite's failure to explain her GPS recorded locations.  (Coke Motion at 16.)  In order to proceed, Satterwhite must identify evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  Of course, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

Satterwhite proffers her comparator evidence as evidence of racial motivation in the firing.  That evidence is supplemented by the fact that Jackson attempted to terminate Satterwhite twice before finally researching and challenging her Motus reports, which tends to show a weakness in the proffered reasoning.  Additionally, the fact that Jackson and the decisionmakers chose to focus on the annotated Motus report instead of also considering the spreadsheet and Spring Mobile documents

submitted with the annotated report tends to show an incoherence to the decision. Even Jackson's initial oral discipline, her first step toward terminating Satterwhite, was brought in part based on uninvestigated (and ultimately unfounded) claims of annoyed clients. Coke United later disciplined *Jackson* for failing to investigate the claims before counseling Satterwhite. (Doc. # 33-3 at 26–28.) Although not required by the employee handbook, Jackson's issuance of a final written warning without talking to Satterwhite demonstrates an unwillingness to investigate all sides of Satterwhite's purported misconduct.

On this record, Satterwhite's evidence of inconsistency and incoherence in Coke United's decision—in combination with the differing treatment of Palmer for substantially similar misconduct—is sufficient for a jury to conclude that the proffered reason for Satterwhite's termination was pretextual and that it was pretext for race discrimination.

**B.** **Satterwhite has met her burden on her retaliatory termination claim.**

To state a *prima facie* case for retaliation, Satterwhite must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). If

Satterwhite presents a *prima facie* case, the claim then proceeds to the same pretext analysis as above. *See McDonnell Douglas*, 411 U.S. 792, 803.

### 1.   Satterwhite has demonstrated a **prima facie** *case.*

In the *prima facie* case, Coke United only challenges Satterwhite's proof of causation. (Coke Motion at 18.) "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Mere temporal proximity must be "very close," and gaps of three to four months are generally insufficient. *See id.* Coke United argues that the eight months between the initial filing of the EEOC charge and the termination defeats causation. (Coke Motion at 19.) Coke United argues that prior problems with Satterwhite's performance defeat causation and that the pendency of the EEOC charge cannot transform all intervening personnel actions into retaliatory actions, citing *Gray v. City of Montgomery*, 756 F. Supp. 2d 1339, 1351 (M.D. Ala. 2010).

*Gray* only found that the mere pendency of a lawsuit is not a "continuing" protected activity. *Id.* However, the court made clear that "a plaintiff can engage in multiple instances of protected activity at different stages of a lawsuit." *Id.* In its Reply, Coke United changes tack: It instead argues that Satterwhite submitted so many different qualifying complaints and charges that it was impossible to terminate

her without being sufficiently close to a protected activity. (Coke Reply at 10–12.) In saying this, Coke United concedes a *prima facie* case of causation.

Satterwhite's first written discipline immediately followed her FMLA leave and first EEOC charge. Jackson's first proposal of termination occurred within weeks of Satterwhite's second EEOC charge, only stymied because her superiors did not agree. Satterwhite was terminated the day after making an internal complaint. The point is not that Satterwhite's conduct created a permanent cloud of protection of her employment status. Instead, critical protected activities in the EEOC proceedings were almost immediately followed by adverse actions against Satterwhite. This is exactly the situation that *Gray* distinguished.

Of course, there could not have been retaliation for activity that had not yet occurred. Thus, the oral discipline could not have been a product of retaliation. However, there is no evidence that Satterwhite was "already on thin ice" when that occurred, as Coke United argues. (Doc. # 32 at 20.) There is no evidence that Satterwhite's ultimate termination was a certain result of her initial conduct. The mere existence of prior misconduct does not break the causal chain.

Satterwhite has thus met her burden of proving a causal connection through showing close temporal proximity to multiple adverse actions.

### 2.     *Satterwhite has presented sufficient proof of pretext.*

In addition to Satterwhite's proof of pretext above, Satterwhite has provided additional evidence tending to show that her protected activities were the true cause of her adverse employment actions.   First, Trammel and the HR Manager's responses to Satterwhite's complaints could plausibly demonstrate frustration with her protected activity, and therefore tend to show a retaliatory animus.   Second, the temporally proximate written discipline was not mentioned to Satterwhite until four days after she returned, calling into question the contention that it was planned before Satterwhite left.   Third, the first written discipline was based in part on communication standards that Jackson never communicated to Satterwhite.   When combined with the evidence of pretext surrounding the ultimate termination discussed above, this is sufficient to create a triable issue of pretext.

### C.   Satterwhite's hostile work environment claim is not supported by the evidence.

In order to proceed with a hostile work environment claim, Satterwhite must show that she was subject to harassment so severe or pervasive as "to alter the terms and conditions of h[er] employment and create a discriminatorily abusive working environment." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1249 (11th Cir. 2014).   The court must look at "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with

the employee's job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246

(11th Cir. 1999).

Satterwhite claims that the disciplinary actions, when viewed together, "show

an environment that was so full of race discrimination and retaliation that it altered

the terms and conditions of [her] working environment." (Satterwhite Response at

25.) However, she does not identify any terms or conditions that were altered and

does not describe how her working environment changed. Indeed, Satterwhite's

position as a BDM in the field naturally insulated her from others in her office. The

evidence tends to show that she rarely needed to interact with anyone at Coke United.

It is hard to see how Satterwhite's working environment was fundamentally altered

by harassment from others when she generally worked alone from her car.

Satterwhite has not connected her discipline to any change in her "working

environment." Indeed, there is no evidence supporting Satterwhite on three of the

four *Mendoza* factors. The facts in this record are insufficient to support a finding

that her discipline altered the terms and conditions of her employment.

Consequently, Coke United is entitled to summary judgment on this claim.

## V. CONCLUSION

For the reasons stated above, it is ORDERED that Coke United's motion for

summary judgment (Doc. # 31) is GRANTED as to the hostile work environment

claims in Counts I and II of the Second Amended Complaint (Doc. # 22) and
DENIED in all other respects.

DONE this 22nd day of December, 2021.

_____/s/ W. Keith Watkins_____
UNITED STATES DISTRICT JUDGE

20